**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| FRANK M. SULLIVAN, III, p/k/a | ) | |
| SURVIVOR, and JAMES PETERIK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No.  1:14-cv-00731 |
| | ) | |
| SONY MUSIC ENTERTAINMENT, | ) | Judge Robert M. Dow, Jr. |
| | ) | Magistrate Judge Sheila M. Finnegan |
| Defendant. | ) | |

**DEFENDANT SONY MUSIC ENTERTAINMENT'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO DISMISS AND FOR PARTIAL SUMMARY JUDGMENT**

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018

**NOVACK AND MACEY LLP**
100 N. Riverside Plaza
Chicago, Illinois 60606

*Attorneys for Defendant*
*Sony Music Entertainment*

## TABLE OF CONTENTS

Table of Authorities .......................................................................................................... iii

Summary of Motion ............................................................................................................ 1

Background ......................................................................................................................... 3

      A.     The 1978 Agreement............................................................................... 3

      B.     The 1983 Amendment............................................................................. 6

      C.     The Instant Dispute ................................................................................ 6

      D.     SME's Contacts with Illinois ................................................................. 6

Argument ............................................................................................................................ 7

I.     SME's Incidental Contacts with Illinois Do Not Give Rise to Personal
      Jurisdiction. .............................................................................................................. 8

      A.     This Court Lacks General Personal Jurisdiction.................................... 8

      B.     This Court Lacks Specific Personal Jurisdiction. ................................ 10

            1.     Specific Jurisdiction Must Be Based on the Defendant's
                "Purposeful Availment" of the Forum. ...................................... 10

            2.     SME's Sole Relevant Conduct—Mailing Royalty Statements and
                Payments to Illinois in Response to Plaintiffs' Unilateral
                Direction—Does Not Constitute "Purposeful Availment." ..................... 11

II.    The Agreement Unambiguously Refutes Survivor's Claim that Downloads Do
      Not Fall Within the Definition of "Phonograph Records."................................... 14

III.   Survivor Failed to Give SME Notice and an Opportunity to Cure with Respect to
      Its Claims Regarding Settlement Proceeds and Marketing Costs.................................... 16

IV.   Even if Survivor Had Given SME Proper Notice, Its Allegations Regarding
      Settlement Proceeds and Marketing Costs Fail to State a Claim..................................... 18

      A.     Survivor's Claim Regarding Settlement Proceeds Must Be Dismissed. .............. 18

      B.     Survivor's Claim Regarding Marketing Costs Must Be Dismissed. .................... 19

Conclusion ........................................................................................................................ 22

TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663
(7th Cir. 2007)............................................................................................19, 21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544
(2007) .................................................................................................................19

*Berg v. Blue Cross & Blue Shield of Utica–Watertown, Inc.*, 1993 WL 467859
(N.D. Cal. Nov. 2, 1993).....................................................................................13

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462
(1985)............................................................................................................10,11

*Burke v. 401 N. Wabash Venture, LLC*, 2010 WL 2330334
(N.D. Ill. June 9, 2010) ................................................................................19, 20

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463
(7th Cir. 2007)..............................................................................................15, 16

*Chi. Police Sergeants Ass'n v. City of Chi.*, 2011 WL 2637203
(N.D. Ill. July 6, 2011) (Dow, J.) .......................................................................16

*Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364
(5th Cir. 2010).....................................................................................................13

*Daimler AG v. Bauman*, 134 S. Ct. 746
(2014)...............................................................................................................8, 9

*Facility Wizard Software, Inc. v. Se. Technical Servs., LLC*, 647 F. Supp. 2d 938
(N.D. Ill. 2009)....................................................................................................20

*Franconero v. Universal Music Grp.*, Order, 12-cv-03382
(C.D. Cal. Apr. 11, 2013), Dkt. 61 .....................................................................15

*Gandhi v. Sitara Capital Mgmt., LLC*, 689 F. Supp. 2d 1004
(N.D. Ill. 2010)....................................................................................................20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846
(2011) ....................................................................................................................9

*Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166
(N.Y. 2002) ...................................................................................................18, 19

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408
(1984)...................................................................................................................10

*Hunt v. Erie Ins. Grp.*, 728 F.2d 1244
    (9th Cir. 1984) .................................................................................................. 11, 12, 13

*Int'l Capital Grp. v. Starrs*, 2010 WL 3307345
    (N.D. Ill. Aug. 19, 2010) ............................................................................................... 20

*Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123
    (S.D.N.Y. 2013) ...................................................................................................... 14, 15

*Montel Aetnastak, Inc. v. Miessen*, — F. Supp. 2d —, 2014 WL 702322
    (N.D. Ill., Jan. 28, 2014) ................................................................................................. 9

*N. Grain Mktg., LLC v. Greving*, — F.3d —, 2014 WL 595767
    (7th Cir. Feb. 18, 2014) ........................................................................................... 7, 8, 9

*Pac. Pejiu Wu Rest. Partners, L.P. v. Haramis*, 2010 WL 1256327
    (Cal. Ct. App. Apr. 2, 2010) ........................................................................................ 17

*Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415
    (10th Cir. 1988) ...................................................................................................... 10, 12, 13

*Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346
    (S.D.N.Y. 2008) ............................................................................................................. 15

*Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657
    (7th Cir. 2002) ................................................................................................................. 3

*Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309
    (8th Cir. 1982) ............................................................................................................... 13

*Steiner v. CBS Broad., Inc.*, 2007 WL 2178542
    (Cal. Ct. App., July 31, 2007) ................................................................................. 18, 19

*Stonebrae, L.P. v. Toll Bros., Inc.*, 2009 WL 1082067
    (N.D. Cal. Apr. 22, 2009) ............................................................................................. 17

*Stuart v. Spademan*, 772 F.2d 1185
    (5th Cir. 1985) ............................................................................................................... 13

*Tamayo v. Blagojevich*, 526 F.3d 1074
    (7th Cir. 2008) ............................................................................................................... 16

*Tamburo v. Dworkin*, 601 F.3d 693
    (7th Cir. 2010) ................................................................................................................. 9

*Warren v. Cardoza Publ'g, Inc.*, 2011 WL 6010758
    (E.D. Mo. Dec. 2, 2011) ............................................................................................... 13

*Walden v. Fiore*, 134 S. Ct. 1115
(2014) ...........................................................................................................................10, 11

**Federal Rules**                                                                                            **Page(s)**

Fed. R. Civ. P. 12(b)(2) .........................................................................................................2, 7, 9

Fed. R. Civ. P. 12(b)(6) .....................................................................................................2, 14, 18

Fed. R. Civ. P. 56 ........................................................................................................................2

**Statutes**                                                                                                 **Page(s)**

Cal. Civ. Code § 1439 ...............................................................................................................17

735 ILCS 5/2-209(c) ...................................................................................................................7

SUMMARY OF MOTION

This lawsuit is an attempt by plaintiffs Frank Sullivan and James Peterik (collectively "Survivor") to rewrite the bargain the parties struck over thirty years ago.

In 1978, Survivor entered into a recording agreement with Scotti Brothers Records, Inc., the predecessor-in-interest of defendant Sony Music Entertainment (Sony Music and its predecessors in interest are referred to herein as "SME"). Under the agreement, SME owns the sound recordings delivered by Survivor and has the unlimited right to exploit them as it chooses. In exchange, SME agreed to pay Survivor royalties as specified in the agreement. The agreement was executed in California and required the royalty statements and payments to be sent to Survivor's representative in California.

The agreement's principal royalty provision provides the royalties that SME pays in connection with its primary business: sales of Survivor records by SME or its licensees. The parties expressly anticipated future technological changes in music recording and distribution by providing that the principal royalty provision would apply to "phonograph records," which they defined to include "any device, *whether now known or unknown*, on or by which sound may be recorded for later transmission to listeners." The parties also included a separate royalty provision applicable to the ancillary business of licensing master recordings for uses "other than phonograph record use"—for example, use in a television commercial or motion picture.

In this lawsuit, Survivor now contends that digital downloads—the predominant "device[s] . . . on or by which" sound is recorded for distribution to consumers today—are not "phonograph records" as defined in the agreement, and that royalties on sales of downloads must be calculated under the provision applicable to licenses for uses "other than phonograph record use." Survivor's complaint fails for four separate reasons.

**First**, the complaint should be dismissed under Rule 12(b)(2) because the Court does not have personal jurisdiction over SME. With respect to this lawsuit, SME's lone connection to Illinois—the mailing of royalty statements and checks to plaintiffs—is an incidental consequence of Survivor's unilateral request that SME mail royalty statements to Illinois rather than to California as specified by the agreement. Such fortuitous contact does not subject SME to jurisdiction in Illinois.

**Second**, even if SME were subject to this Court's jurisdiction, Survivor's primary claim for royalties relating to digital distribution should be dismissed under Rule 12(b)(6) for failure to state a cause of action. The claim hinges entirely on the assertion that downloads are not "phonograph records" as defined in the agreement. But that allegation is contradicted by the plain language of the agreement, as multiple courts have found in connection with similar claims by other artists that downloads are not "phonograph records."

**Third**, SME is entitled to summary judgment under Rule 56 dismissing Survivor's claims regarding (i) consideration received by SME from disputes with third parties over unauthorized uses of Survivor master recordings (referred to herein as "settlement proceeds"), and (ii) marketing costs. The indisputable evidence shows that Survivor has failed to give SME notice and an opportunity to cure these alleged breaches, which is a condition precedent to asserting a claim for breach under the agreement.

**Finally**, even if Survivor had given SME notice of the claims regarding settlement proceeds and marketing costs, these claims should be dismissed under Rule 12(b)(6) for failure to state a cause of action.

BACKGROUND

## A.    The 1978 Agreement

In 1978, Survivor signed a recording contract with SME's predecessor in interest, Scotti Brothers Records, Inc. (the "1978 Agreement" or "1978 Agmt.," attached as Exhibit A to the Declaration of David Jacoby dated March 25, 2014).[1]  Survivor agreed to compose and record musical performances (the "master recordings" or "masters"), and to deliver those masters to SME.  (1978 Agmt. ¶ 2(a)).  The masters became "entirely [the] property" of SME, such that SME has the "exclusive worldwide right" to exploit—or "refrain from" exploiting—those recordings.  (*Id.* ¶ 4).  In exchange, SME agreed to pay royalties for various uses (or "exploitations") of the masters pursuant to ¶ 6, which governs sales by both SME and its licensees.

The first royalty provision in the agreement, ¶ 6(a), sets the rates for the principal business of any record company—sales of the artist's records in the United States, whether directly or through licensees.  It contains three subparts.  Paragraph 6(a)(i) applies both to sales of Survivor records in disc formats (whether sold by SME or by its licensees) and to sales of such records in non-disc formats by SME (but not by its licensees):

> In respect of LP records sold in the United States in the form of discs, and in respect of LP records sold by us in the United States in the form of prerecorded tapes (including reel-to-reel tapes, cartridges and cassettes) or other recorded devices (other than discs), we shall pay you a royalty at the rate of ten percent (10%) of the suggested retail list price from time to time of such records . . . .

---

[1]    In considering a motion to dismiss a contract claim, a court can take into account the underlying agreement itself.  *See, e.g.*, *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss. This exception is aimed at cases interpreting, for example, a contract." (quotations and citations omitted)).

3

Paragraph 6(a)(ii) then sets the rate for domestic sales of "singles" sold by SME or its licensees:

> [I]n respect of records sold in the United States in the form of singles (as defined herein), we shall pay you a royalty rate of ten percent (10%) of the suggested retail list price from time to time of such records . . . . [2]

Finally, ¶ 6(a)(iii) provides for payment of one-half of the ordinary rate when records in non-disc formats are sold by SME's licensees rather than by SME:

> [I]n respect of records sold by our licensees in the United States in the form of pre-recorded tapes (including reel-to-reel tapes, cartridges and cassettes) or other recorded devices (other than discs), we shall pay you a royalty at the rate of one-half (1/2) of the aforementioned royalty rate based upon the suggested retail list price . . . .

Taken together, the three provisions of ¶ 6(a) govern domestic sales of Survivor "phonograph records," whether those records are sold by SME or by an SME licensee. The parties anticipated future, yet-unknown recording technologies—and provided that these royalty provisions would govern regardless—by defining the terms "record" and "phonograph record" as "any device, *whether now known or unknown*, on or by which sound may be recorded for later transmission to listeners . . . ." (*Id.* ¶ 18 (emphasis added)).

The foreign analog to ¶ 6(a) is ¶ 6(b), which sets the rates for sales of Survivor records outside the United States:

> In respect of LP records and singles sold outside of the United States we shall pay you a royalty at the rate of the following applicable percent of the suggested retail list price . . . .

Unlike ¶ 6(a), ¶ 6(b) does not distinguish between records sold by SME and its licensees, but instead applies broadly to foreign sales regardless of by whom the records are sold.

Following the primary domestic and foreign royalty provisions in ¶¶ 6(a) and (b), ¶ 6(c) sets forth a series of qualifications and exceptions to these rates, largely for exploitations

---

[2] The agreement defines a "single" as "a seven (7) inch or twelve (12) inch 45-rpm record." (1978 Agmt. ¶ 18).

4

ancillary to SME's basic business of producing and distributing its own record releases through normal retail channels.  For instance, ¶ 6(c)(i) applies to "direct mail" record clubs, and ¶ 6(c)(iv) applies to records sold at reduced rates to government agencies, educational institutions, and libraries.  The very last provision of this paragraph, ¶ 6(c)(v), provides for a royalty of 50% of the net amount received by SME from three kinds of licenses:

> [T]he royalty rate [1] in respect of Masters licensed by us for phonograph record use on a flat-fee basis, or [2] with respect to so-called compilation albums sold through retail stores in conjunction with special radio or television advertisements (including, without limitation, records of the type presently distributed by K-Tel) on a royalty basis and [3] for all other types of use (other than phonograph record use) on a flat-fee or royalty basis shall be an amount equal to fifty percent (50%) of the net flat fee or net royalty, as the case may be, received by us or credited against advances previously received by us in respect of each such use. . . .

(1978 Agmt. ¶ 6(c)(v)).   Under this paragraph, (the "Fifty-Percent Provision"), Survivor is entitled to 50% of SME's net receipts in three circumstances—namely, when SME licenses a Survivor master to a third party:

1. On a <u>flat-fee basis</u> for any <u>phonograph-record use</u>;

2. On a <u>royalty basis</u> for use in a <u>compilation album</u>; and

3. On a <u>flat-fee *or* royalty basis</u> for any <u>non-phonograph-record use</u>.

(*See id.*).  Thus, with respect to masters licensed for phonograph-record uses, Survivor is entitled to 50% net receipts *only if* the licensee in question pays SME on a flat-fee basis.

The 1978 Agreement also contains a notice-and-cure provision under which neither party can be deemed to have breached the contract unless (i) the other party first gives "specific written notice by certified or registered mail" of the alleged breach and (ii) the allegedly breaching party fails to cure within thirty days.  (*Id.* ¶ 17(c)).  Finally, the agreement contains a California choice-of-law provision.  (*Id.* ¶ 17(h)).

### B.     The 1983 Amendment

In 1983, the parties amended their agreement to, among other things, set the royalty rates applicable to new Survivor master recordings delivered to SME (the "1983 Amendment" or "1983 Agmt.," attached as Exhibit B to the Jacoby Declaration).  The amendment states that "the terms and conditions of the [1978 Agreement] as specifically modified by [the 1983 Amendment] shall continue to be the terms and conditions which shall control the relationship between the parties."  (*Id.* ¶ 7).  The complaint does not allege that any royalty provision of the 1983 Amendment applies here.

### C.     The Instant Dispute

In September 2012, Survivor sent SME a letter by Federal Express asserting that Survivor had been underpaid in connection with digital downloads.  (Jacoby Decl. ¶ 11 & Ex. F).  Survivor filed its complaint on January 31, 2014, seeking damages and a declaratory judgment as to three alleged breaches: (i) underpayment of royalties in connection with digital distributions of Survivor recordings; (ii) failure to pay royalties on settlement proceeds; and (iii) improper deduction of marketing costs.  (Compl., Dkt. 1, ¶ 23).

### D.     SME's Contacts with Illinois

SME is a Delaware general partnership.  Its partners are citizens of Delaware and New York, and SME's principal place of business is in New York.  (Jacoby Decl. ¶ 5; Compl. ¶ 5).  SME maintains no offices or facilities in Illinois, and is not qualified to do business in Illinois.  (Jacoby Decl. ¶ 5).

The parties' agreements were negotiated, drafted, executed, and performed in California.  The 1978 Agreement was executed by SME in Los Angeles, was sent to Survivor through its attorneys in Los Angeles, and recites that it was entered into in California.  (1978 Agmt. at 1, ¶ 17(h)).  The 1983 Amendment was executed by SME in Santa Monica, and was likewise sent

to Survivor through its attorneys in Los Angeles.  (1983 Am. at 1).  Survivor was obligated to deliver the master recordings to SME's offices in Los Angeles, and SME was obligated to send all royalty statements and payments owed under either of the agreements to Survivor in Los Angeles.  (1978 Agmt. ¶¶ 16, 18; 1983 Am. ¶ 3(d)).  All written notices required under the contract were to be delivered to both parties at California addresses.  (1978 Agmt. ¶ 16).

At some point between 1987 and 1996, Survivor directed SME to send royalty statements and payments to an Illinois address.  (Jacoby Decl. ¶ 7 & Ex. C).  In 2001, Survivor directed SME to split the royalty payments, sending a portion to Illinois and a portion to plaintiff James Peterik's attorney in Los Angeles.  (*Id.* ¶ 8 & Ex. D).  In 2003, Mr. Peterik directed SME to send his royalty payments to Illinois.  (*Id.* ¶ 9 & Ex. E).  As a result, SME now sends plaintiffs' royalty statements and payments to addresses in Illinois.  (*Id.* ¶ 10).

ARGUMENT

SME's motion should be granted in all respects.  *First*, SME does not have contacts sufficient to subject it to either general or specific personal jurisdiction in Illinois.  *Second*, even if this Court did have jurisdiction, Survivor's claim concerning digital downloads should be dismissed.  This claim is predicated on the assertion that digital downloads are not "phonograph records" as defined in the 1978 Agreement, but the plain language of the definition refutes that allegation.  *Third*, SME is entitled to summary judgment on Survivor's claims regarding settlement proceeds and marketing costs, as the undisputed evidence shows Survivor failed to give SME contractually required notice and an opportunity to cure.  *Finally*, even if Survivor had given SME notice of these non-download claims, its allegations fail to state a claim and should be dismissed.

7

I.  **SME's Incidental Contacts with Illinois Do Not Give Rise to Personal Jurisdiction.**

The complaint must be dismissed under Rule 12(b)(2) for lack of personal jurisdiction. Federal courts in Illinois have personal jurisdiction over non-Illinois defendants only to the extent they are subject to the personal jurisdiction of Illinois state courts. *See N. Grain Mktg., LLC v. Greving*, — F.3d —, 2014 WL 595767, *3 (7th Cir. Feb. 18, 2014). Because Illinois law authorizes state courts to exercise jurisdiction on any basis permitted by the United States Constitution, 735 ILCS 5/2-209(c), the question of whether SME falls within the reach of Illinois's long-arm statute merges with the question of whether the exercise of personal jurisdiction comports with due process. *Greving*, — F.3d —, 2014 WL 595767, at *3.

Under the Due Process Clause of the Fourteenth Amendment, this Court has neither general nor specific personal jurisdiction over SME, because SME does not maintain continuous and systematic contacts with Illinois, nor do Survivor's alleged injuries arise out of any actions that SME has purposefully directed into this forum.

A.  **This Court Lacks General Personal Jurisdiction.**

SME is not subject to general jurisdiction in Illinois. A defendant business entity is subject to a forum's general jurisdiction only if its "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)) (internal quotations and brackets omitted). This concept of being "at home" is equivalent to the concept of domicile for an individual. *See id.* at 760 ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." (quoting *Goodyear*, 131 S. Ct. at 2853–54) (internal quotations omitted)).

Under this test, general jurisdiction is permitted only if the foreign entity's presence is "comparable to a domestic enterprise." *Id.* at 758 n.11.

In *Daimler*, the Supreme Court ruled that the California courts lacked general jurisdiction over the defendant even though its subsidiary was the largest seller of luxury cars in the forum, maintained a regional sales office in the forum, and operated a "Vehicle Preparation Center" in the forum—all contacts that were imputed to the defendant for the purpose of the Court's personal-jurisdiction analysis.[3]  *Id.* at 752.  The Court held that despite this "substantial, continuous, and systematic course of business" in California, the defendant was not subject to general jurisdiction because it could not be "fairly regarded as at home" in California.  *Id.* at 760–61 (citations omitted).

Here, SME's contacts with Illinois fall far below the "at home" standard articulated by the Supreme Court.  SME is in no way comparable to a domestic Illinois enterprise:  it is a Delaware general partnership with Delaware and New York general partners; it maintains its principal place of business in New York; it has no offices or facilities of any kind in Illinois; indeed, it is not even qualified to do business in Illinois.  (Jacoby Decl. ¶ 5).[4]  Under *Daimler* and *Goodyear*, SME is not subject to general jurisdiction in Illinois.

---

[3]     *See Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) ("Even if we were to assume that . . . [the subsidiary's] contacts are imputable to Daimler, there would still be no basis to subject Daimler to general jurisdiction in California . . . ."); *id.* at 762 ("It was therefore error for the Ninth Circuit to conclude that Daimler, even with [the subsidiary's] contacts attributed to it, was at home in California . . . .")

[4]     "In ruling on a Rule 12(b)(2) motion to dismiss, the Court may consider matters outside the pleadings."  *Montel Aetnastak, Inc. v. Miessen*, — F. Supp. 2d —, 2014 WL 702322, *6 (N.D. Ill., Jan. 28, 2014).

## B. This Court Lacks Specific Personal Jurisdiction.

### 1. Specific Jurisdiction Must Be Based on the Defendant's "Purposeful Availment" of the Forum.

This Court likewise lacks specific personal jurisdiction over SME. Specific jurisdiction is proper only if (1) the defendant has purposefully directed its activities at the forum, or has purposely availed itself of the privilege of conducting business there, and (2) the plaintiff's alleged injury arises out of those forum-related activities. *Greving*, — F.3d —, 2014 WL 595767 at *4 (quoting *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010)). This purposeful-availment standard—which requires the defendant's forum-related activities to be "substantial"—"ensures that a defendant's amenability to jurisdiction is not based on random, fortuitous, or attenuated contacts, but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (quotations and citations omitted).

Contacts by the defendant with the forum therefore are not sufficient to give rise to specific jurisdiction if they arise from unilateral actions by the plaintiff, rather than by the defendant's own purposeful availment of the privilege of doing business within the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."); *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1420 (10th Cir. 1988) ("Purposeful availment analysis turns upon whether the defendant's contacts are attributable to his own actions or solely to the actions of the plaintiff . . . ." (quotations omitted).) As the Supreme Court reiterated just last month, in order to permit specific jurisdiction, "the relationship must arise out

of contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (quoting *Burger King*, 471 U.S. at 475) (emphasis in original).

Thus, jurisdiction can be asserted over a defendant who "enter[s] a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State." *Id.*, (quoting *Burger King*, 471 U.S. at 479-80). Where a contractual relationship does not envision such wide-reaching contacts with the forum, however, contacts that result incidentally from the plaintiff's presence in the forum are insufficient. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated contacts' he makes by interacting with other persons affiliated with the State." *Walden*, 134 S. Ct. at 1123 (quoting *Burger King*, 471 U.S. at 475).

### 2. *SME's Sole Relevant Conduct—Mailing Royalty Statements and Payments to Illinois in Response to Plaintiffs' Unilateral Direction— Does Not Constitute "Purposeful Availment."*

Under the foregoing standards, SME's contacts with Illinois are insufficient to give rise to specific personal jurisdiction. Survivor claims that SME breached the parties' contract by failing to properly account for various exploitations of the master recordings. (Compl. ¶¶ 21–25). But the contract did not in any way envision "continuing and wide-reaching contacts" in Illinois. It was negotiated, drafted, and executed in California. (*Supra* 6). It also called for performance entirely in California: it required Survivor to deliver its master recordings to SME in California, and SME to send royalty statements and payments to Survivor's California attorneys. (1978 Agmt. ¶ 16; 1983 Am. ¶ 3(d)). SME's only contact with Illinois relating to the alleged breaches is SME's semiannual mailing of royalty statements and payments to Survivor in Illinois, rather than to California as contemplated by the agreement, at Survivor's unilateral request. These contacts with Illinois are random and fortuitous—Survivor could just as well have asked SME to send statements to any other State in the Union. Because these contacts do

11

not result from any purposeful activity on the part of SME, they cannot give rise to personal jurisdiction. *See Walden*, 134 S. Ct. at 1122 ("[T]he relationship must arise out of contacts that the defendant *himself* creates. . . .").

Federal courts consistently dismiss breach-of-contract complaints for lack of personal jurisdiction when, like here, the defendant's relevant contact with the forum consists of post-execution mailings, based on the plaintiff's unilateral actions, into a different forum than the one contemplated at the time of execution. For instance, in *Hunt v. Erie Insurance Group*, the plaintiff policyholder, a Virginia resident, was injured while traveling in Colorado. 728 F.2d 1244, 1245 (9th Cir. 1984). She later relocated to California for long-term medical treatment, where she received both partial payments and a refusal notice from the defendant insurance company. *Id.* Plaintiff contended defendant's promise to pay benefits "follow[ed] the claimant wherever the claimant goes, since the policy does not provide otherwise," such that defendant's mailing of the payments and the notice of refusal into California were sufficient to establish specific jurisdiction. *See id.* at 1246 (internal quotations omitted). The Ninth Circuit rejected the argument that these fortuitous ties were enough, and held California lacked jurisdiction over the foreign defendant:

> *We cannot agree that the requisite minimum contacts are established because a plaintiff's move into a state requires the defendant to send communications into that forum.* . . . The mere fact that Erie communicated with Hunt in the state, and may have committed a tort in the exchange of correspondence, does not show that Erie purposefully availed itself of the privilege of conducting business in California. *Hunt's move to California forced Erie to send mail to that State concerning her claim.*

*Id.* at 1248 (emphasis added).

The Tenth Circuit reached a similar conclusion in *Rambo v. American Southern Insurance Co.*, 839 F.2d 1415 (10th Cir. 1988). In that case, the plaintiff relocated to Oklahoma

12

after having entered an insurance contract in Alabama and filing a claim in Texas. *Id.* at 1416. When the plaintiff sued in Oklahoma, the Tenth Circuit held the Oklahoma courts did not have personal jurisdiction over the defendant insurance companies, stating, "The Oklahoma contacts were fortuitous, resulting from the Rambos['] change of residence *after* the insurance policy was issued and the claim was filed." *Id.* at 1420 (emphasis in original). Thus, the plaintiffs' unilateral activity that resulted in the defendant mailing materials into the state did not bring the foreign defendant under the jurisdiction of the forum. Many other courts have reached similar results.[5]

These principles have been applied specifically in the context of royalty payments. In *Warren v. Cardoza Publishing, Inc.*, the court determined that it lacked personal jurisdiction over the defendant publishers, despite the facts that defendants sent "royalty statements and accompanying payments" to plaintiff in Missouri, and that plaintiff drafted "roughly one-half" of the literary work at issue in Missouri. 2011 WL 6010758, *6–7 (E.D. Mo. Dec. 2, 2011). The court dismissed the complaint because, *inter alia*, defendants had "no contacts with Missouri relating to [the contract] beyond the subject royalty statements" and the lawsuit arose from a contract that "was negotiated outside of Missouri and sent to Plaintiff at a Kansas address." *Id.*

---

[5]     *E.g., Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 369–70 (5th Cir. 2010) ("Kaiser's payment of a limited number of claims for treatment of Kaiser's insureds, based on the unilateral decisions of those insureds who sought treatment in Louisiana, does not establish purposeful contact . . . ."); *Stuart v. Spademan*, 772 F.2d 1185, 1194 (5th Cir. 1985) ("Spademan's mailing of payments to the plaintiffs in Texas can hardly be termed significant in terms of determining purposeful availment of the benefits of the forum state's laws."); *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982) ("The use of interstate facilities (telephone, the mail) [and] the making of payments in the forum state . . . are secondary or ancillary factors and cannot alone provide the 'minimum contacts' required by due process."); *Berg v. Blue Cross & Blue Shield of Utica–Watertown, Inc.*, 1993 WL 467859, *2–4 (N.D. Cal. Nov. 2, 1993) (finding no personal jurisdiction despite multiple payments by the defendant insurer into the forum).

13

at *7.  The court explained, "Defendants had no indication whatsoever that they were entering into a contract with any connection at all to Missouri.  Accordingly, it cannot be said Defendants purposefully availed themselves of Missouri law."  *Id.*

As in *Hunt*, *Rambo*, and *Warren*, Survivor's unilateral request to have royalty statements sent to Illinois—which "forced [SME] to send mail to that State concerning [the contract]"—is insufficient to give rise to specific jurisdiction.  *See Hunt*, 728 F.2d at 1248; *id.* at 1245 ("We cannot agree that the requisite minimum contacts are established because a plaintiff's move into a state requires the defendant to send communications into that forum.").

## II.    The Agreement Unambiguously Refutes Survivor's Claim that Downloads Do Not Fall Within the Definition of "Phonograph Records."

Personal jurisdiction objections aside, Survivor's primary claim regarding digital downloads should be dismissed under Rule 12(b)(6) for failure to state a claim.

Survivor contends that (i) SME has licensed Survivor masters to digital retailers such as iTunes for distribution as downloads, and (ii) "[t]hese licenses are for 'other types of use (other than phonograph record use),' for which Sony is obligated to pay a 50 percent royalty to Survivor."  (Compl. ¶ 16 (quoting 1978 Agmt. ¶ 6(c)(v))).  Even deeming Survivor's licensing allegation to be true for purposes of SME's 12(b)(6) motion, however, downloads fall squarely within the agreement's definition of "phonograph records."  Survivor's claim that licenses for distribution as downloads are licenses for "*other than* phonograph record use" is therefore refuted by the plain terms of the parties' agreement.

Like most recording agreements, the 1978 Agreement expressly anticipated future, yet-unknown recording technologies.  It defines "phonograph record" to mean "any device, *whether now known or unknown*, on or by which sound may be recorded for later transmission to

14

listeners . . . ." (1978 Agmt. ¶ 18 (emphasis added)). This broad and open-ended definition necessarily includes recordings distributed to consumers as digital music files.

Other courts have repeatedly held that digital downloads constitute "phonograph records" under contractual definitions virtually identical to this one. For instance, the Southern District of New York recently ruled that "digital downloads are clearly Records" under a provision defining "'Records' and 'Phonograph Records'" as "*[a]ny device now or hereafter known* on or by which sound may be recorded and reproduced . . . ." *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 131–32 (S.D.N.Y. 2013) (emphasis added). The *Malmsteen* court noted further that the broad language "manifest[ed] the clear intent of the contracting parties that the definition of Record encompass as-yet-undeveloped technologies," such that the provision "evince[d] a practical recognition of the constantly evolving nature of music recording technology." *Id.* at 132; *see also Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 354 (S.D.N.Y. 2008) (finding "future technologies" like digital downloads were encompassed by the definition of "Records"; "The phrase 'now or hereafter known,' when referring to forms of reproduction, reveals that future technologies are covered by the agreement.").

The Central District of California considered the scope of a similar contractual definition in *Franconero v. Universal Music Group*, Order, 12-cv-03382 (C.D. Cal. Apr. 11, 2013), Dkt. 61 (attached hereto as Appendix A). The recording agreement in that case defined "phonograph record" and "record" as "phonograph records and record albums of any r.p.m. and *any similar devices for the reproduction of sound* reproduced on any material *which may now or hereafter be known* . . . ." *Id.* at 6 (emphasis added). The *Franconero* court reached the same conclusion as the *Malmsteen* court, holding the contracts at issue "contemplated that the term 'record'

encompassed any future medium that transmitted Plaintiff's sound recordings, including digital downloads and ringtones." *Id.*

So too here, the 1978 Agreement's definition of "phonograph records" as including "any device, whether now known or unknown, on or by which sound may be recorded for later transmission to listeners" necessarily encompasses digital downloads. (1978 Agmt. ¶ 18). Thus, the plain terms of the parties' agreement contradict Survivor's claim that licenses for distribution of downloads are subject to a royalty provision applicable to licenses for "other than phonograph record use," and the claim must be dismissed. *See Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 466 (7th Cir. 2007) ("To the extent that the contracts contradict the Complaint, the contracts trump the facts or allegations presented in the Complaint.").[6]

## III.  Survivor Failed to Give SME Notice and an Opportunity to Cure with Respect to Its Claims Regarding Settlement Proceeds and Marketing Costs.

SME is entitled to summary judgment dismissing Survivor's claims regarding third-party settlement proceeds and the deduction of marketing costs, because Survivor has failed to satisfy a contractual condition precedent to asserting these claims.[7]  Under the agreement, a party cannot

---

[6]     Although not alleged in the complaint, the Fifty-Percent Provision does contain a clause applicable to licenses for phonograph-record use.  As noted above, however, this clause applies only when the licensee pays SME on a flat-fee basis.  (*See supra* 4–5).  Here, not only does the complaint fail to allege that digital retailers pay SME on a flat-fee basis, it affirmatively alleges that they do *not* do so.  (Compl. ¶ 17 (alleging that SME receives compensation "for each" download, rather than a single one-time payment for the alleged license to the download retailer)).  *See Chi. Police Sergeants Ass'n v. City of Chi.*, 2011 WL 2637203, *7 (N.D. Ill. July 6, 2011) (Dow, J.) ("A Plaintiff 'pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits.'") (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008)).

[7]     SME moves for summary judgment rather than dismissal of these claims to permit the Court to consider the declaration of David Jacoby and the exhibits attached thereto.

be deemed to be in breach unless the other party has first given specific written notice of the alleged breach and an opportunity to cure:

> Neither of us shall be deemed to be in breach of any of our respective obligations hereunder unless and until the other shall have given specific written notice by certified or registered mail, return receipt requested, of the nature of such breach and the party receiving notice shall have failed to cure such breach within thirty (30) days after receipt of such written notice.

(1978 Agmt. ¶ 17(c)). Here, Survivor gave SME notice of its download claim, but failed to do so with respect to its claims regarding settlement proceeds and marketing costs, thereby depriving SME of its bargained-for opportunity to cure prior to expending resources on litigation.

Under California law, compliance with such notice-and-cure provisions is a condition precedent to filing suit.[8] For instance, in *Pacific Pejiu Wu Restaurant Partners, L.P. v. Haramis*, the California Court of Appeals affirmed the dismissal of plaintiff's claims when plaintiff failed to give contractually required notice and an opportunity to cure. 2010 WL 1256327, *18 (Cal. Ct. App. Apr. 2, 2010). The *Pacific Pejiu* court held, "There is no dispute that Haramis did not give Pejiu the required written notice of default. . . . Because Haramis never satisfied this condition precedent, he could not, as a matter of law, maintain claims for damages based on those defaults." *Id.*; *see also* Cal. Civ. Code § 1439 ("Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself . . . .").

In addition, to satisfy a notice-and-cure provision, the notice must be sufficiently specific to allow the defendant a meaningful opportunity to cure. *See Stonebrae, L.P. v. Toll Bros., Inc.*,

---

[8]    As noted *supra* at 5, the parties' contract contains a California choice-of-law provision.

2009 WL 1082067, *5 (N.D. Cal. Apr. 22, 2009) (ruling that contractually required written notice must "give[] Stonebrae fair notice that there has been a failure to perform and describe[] with sufficient specificity the work that has not been performed such that Stonebrae is able to cure").

In this case, Survivor sent a letter by Federal Express to SME in September 2012 asserting that SME did not apply the correct royalty rate in accounting for sales of digital downloads. (Jacoby Decl. ¶ 11 & Ex. F). (SME does not dispute that this form of delivery substantially complied with the agreement's requirement of notice by certified or registered mail.) But plaintiffs sent no letter to SME asserting any breach relating to settlement proceeds or marketing costs before commencing this lawsuit. (56.1 Stmt. ¶¶ 9–10). SME was thus denied the opportunity to investigate—and, if appropriate, to cure—any alleged breach, and under the terms of the parties' agreement, SME cannot "be deemed to be in breach." This Court should therefore grant SME's motion for partial summary judgment as to these claims.

**IV. Even if Survivor Had Given SME Proper Notice, Its Allegations Regarding Settlement Proceeds and Marketing Costs Fail to State a Claim.**

Setting aside Survivor's failure to give SME proper notice, Survivor's claims regarding settlement proceeds and marketing deductions should be dismissed under Rule 12(b)(6) for failure to state a claim.

**A. Survivor's Claim Regarding Settlement Proceeds Must Be Dismissed.**

Survivor alleges it has a right to a portion of the settlement proceeds SME has received from certain third parties in connection with lawsuits relating to those third parties' unauthorized use of SME-owned master recordings. (Compl. ¶¶ 18, 23(b)). But Survivor does not identify any contractual provision that entitles it to such settlement proceeds (because there is no such

provision), nor does it—or can it—articulate how its alleged share would be calculated, since the parties' agreement does not entitle Survivor to any share of such monies.

It is well-established that record companies are not obligated to pay artists royalties other than those specifically set forth in the parties' recording contracts, even in connection with revenue earned from use of the artist's master recordings. *See, e.g.*, *Steiner v. CBS Broad., Inc.*, 2007 WL 2178542, *3–6 (Cal. Ct. App., July 31, 2007); *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171–73 (N.Y. 2002). For instance, in *Steiner*, the court considered whether a record company owed royalties on revenue received from synchronization licenses in connection with the manufacture of videocassettes and DVDs. *Id.* The court held plaintiff was not entitled to royalties because the contract required payments only in connection with synchronization licenses relating to "theatrical motion picture[s]," not home-use products like DVDs. *Id.* at *6. Thus, because the agreement did not mandate royalties for the revenue stream at issue, the artist was not entitled to recover. *Id.*; *see also Greenfield,* 780 N.E.2d at 171–73 (holding that, "[h]owever sympathetic plaintiffs' plight," plaintiffs were not entitled to royalties on revenue earned from certain licenses to use their recordings, because no royalty provision addressed such uses).

Here, like the plaintiffs in *Steiner* and *Greenfield*, Survivor demands that SME share money with Survivor despite the absence of any provision in the parties' agreement requiring SME to do so. Because Survivor cannot identify any provision of the agreement that SME has breached, the claim must be dismissed.

### B. Survivor's Claim Regarding Marketing Costs Must Be Dismissed.

Survivor alleges that SME "improperly charged and deducted from royalties due to Survivor certain promotion and marketing costs and expenses." (Compl. ¶ 19). Survivor elsewhere describes these deductions as "unauthorized and unsubstantiated," (*id.* ¶ 23(c)), but

gives no indication of the nature of the allegedly improper deductions, what transactions they relate to, and what contractual provision (if any) the unspecified deductions purportedly violate. These vague and unsubstantiated allegations fail to state a claim, as they do not give SME fair notice of the alleged "grounds of [Survivor's] entitlement to relief." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Following the Supreme Court's decisions in *Iqbal* and *Twombly*, this District has often ruled that in order to state a claim for breach of contract, a plaintiff must identify the specific contractual provision that the defendant allegedly breached. For instance, the complaint in *Burke v. 401 N. Wabash Venture, LLC*, alleged the defendant had breached a contract by "using the sixth floor for parking, making changes to the budget, and providing inadequate reserves when the developer turned over the building to the condominium association." 2010 WL 2330334, *2 (N.D. Ill. June 9, 2010) (internal numbering omitted). The court dismissed the claims because the complaint failed to allege a breach of any particular contractual provision:

> [I]n each of these counts, plaintiff asserts that defendant breached a contract, but plaintiff fails to point to any contract provision that was breached. *The Court fails to see how, post-Iqbal, a plaintiff could state a claim for breach of contract without alleging which provision of the contract was breached.*

*Id.* (emphasis added). Thus, although the complaint described certain of defendant's activities— for instance, "using the sixth floor for parking"—it failed to identify the basis for its contention that those activities breached any contractual obligation owed by the defendant.

The plaintiffs in *Gandhi v. Sitara Capital Management, LLC*, similarly "describ[ed] the alleged breach" in the complaint, but failed to identify any provision purportedly giving rise to their claims. 689 F. Supp. 2d 1004, 1016 (N.D. Ill. 2010). The court granted defendants' motion to dismiss, explaining, "Although plaintiffs are not required in bringing their breach of contract

20

claim to plead facts with particularity, they must at minimum allege a short and plain statement of the claim showing that they are entitled to relief." *Id.* The court concluded that because the plaintiffs did not "identify[] in their complaint the provision of the [contract] allegedly breached, plaintiffs fail[ed] to satisfy this low threshold." *Id.*[9]

Here, Survivor alleges that SME took unspecified "unauthorized and unsubstantiated deductions" for "marketing costs and expenses." But the complaint identifies neither the deductions at issue, which transactions they relate to, nor any specific contractual provision that they violate. Consequently, SME has no way to evaluate the accuracy of its allegations, much less to defend against them. (The lack of basic information here also highlights the practical significance of Survivor's failure to abide by the contractual obligation to give SME "*specific* written notice . . . of the nature*" of any alleged breach before bringing suit.)

By any measure, Survivor's marketing-costs allegations are not sufficiently specific to state a claim and must be dismissed. *See Airborne Beepers*, 499 F.3d at 667 (stating that a claim is insufficient when the factual allegations are "so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled").

---

[9]  A handful of Northern District cases have ruled that a plaintiff is not absolutely required to identify the specific contractual provision that a defendant has allegedly breached. But even in those few cases, the courts have made plain that the complaint must plead facts sufficient to establish that a certain contractual obligation exists, and that the defendant breached that obligation. *See Facility Wizard Software, Inc. v. Se. Technical Servs., LLC*, 647 F. Supp. 2d 938, 950 (N.D. Ill. 2009) ("A plaintiff's allegations must be specific enough to allow the defendant to draft a responsive pleading by giving the defendant fair notice of the claims and the basis for the claims."); *Int'l Capital Grp. v. Starrs*, 2010 WL 3307345, *1 (N.D. Ill. Aug. 19, 2010) (granting motion to dismiss; "[A] plaintiff must still plead enough facts to establish a breach, for example, the existence of some unsatisfied obligation."). Even under this standard, a complaint still must be dismissed if it fails to identify the alleged contractual basis of the claim.

## CONCLUSION

For the foregoing reasons, SME's motion should be granted in its entirety, and SME should be granted such other and further relief as this Court determines is appropriate.

Dated:   March 25, 2014                              Respectfully submitted,

                                           /s/ Jonathan M. Sperling
                                           Jonathan M. Sperling
                                           Douglas S. Curran
                                           **COVINGTON & BURLING LLP**
                                           The New York Times Building
                                           620 Eighth Avenue
                                           New York, NY 10018
                                           (212) 841-1000
                                           (212) 841-1010 (fax)
                                           jsperling@cov.com
                                           dcurran@cov.com

                                           Stephen Novack
                                           Joshua E. Liebman
                                           **NOVACK AND MACEY LLP**
                                           100 N. Riverside Plaza
                                           Chicago, Illinois 60606
                                           (312) 419-6900
                                           (312) 419-6928 (fax)
                                           snovack@novackmacey.com
                                           jliebman@novackmacey.com

                                           *Attorneys for Defendant*
                                           *Sony Music Entertainment*

# Appendix A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES - GENERAL

| Case No. | **CV 12-3382 JGB (AGRx)** | Date | April 11, 2013 |
|---|---|---|---|

| Title | ***Connie Franconero v. Universal Music Corp.*** |
|---|---|

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

**Proceedings:**   **Order GRANTING Defendant's Motion to Dismiss (Doc. No. 35) (IN CHAMBERS)**

Before the Court is Defendant's Motion to Dismiss the Second Amended Complaint. ("Motion," Doc. No. 35.)  After reviewing all papers filed in support of and in opposition to the Motion and the arguments presented at the April 8, 2013 hearing, the Court GRANTS the Motion to Dismiss WITH LEAVE TO AMEND.

## I. INTRODUCTION

On December 6, 2012, Plaintiff Connie Franconero, previously known as Connie Francis ("Plaintiff" or "Francis"), filed the operative Second Amended Compliant against Defendant Universal Music Corp. ("Defendant" or "Universal").[1]  (SAC, Doc. No. 31.)  Plaintiff is a recording artist who has recorded over 1,000 compositions.  (SAC, ¶ 1.)

The SAC alleges that on January 5, 1959, Universal and Francis entered into a contract. ("1959 Contract," SAC, ¶ 4.)  The 1959 Contract required Francis to produce 16 "45 RPM record sides" each year for three years.  (SAC, ¶ 4.)  Universal manufactured and released for sale the 45 RPM records as singles and in the form of a record album.  (Id.)  Francis received five percent of the ninety percent taken in by Universal for the 45 RPM records manufactured and sold by Universal.  (SAC, ¶ 5.)

---

[1] Universal has also gone by the name UMG Recordings, Inc. and is a successor to PolyGram Records, Inc, Polydor Incorporated, and MGM Records.  (SAC, ¶ 2.)  The Order refers to all current and former names of Defendant as "Defendant" or "Universal."

**CIVIL MINUTES—GENERAL**

The SAC alleges that the 1959 Contract did not state a calculation of royalty payments for recordings not mechanically manufactured and sold by Universal. (Id.) The SAC states that "[i]t was separately, explicitly, and in the written [1959 Contract] provided as a condition and promise that both parties were required to arrive at a mutual agreement for the release of non-mechanical copies from the master, which are distributed and sold by unaffiliated third-party licensees under their own label." (Id.) The SAC cites a provision of the 1959 Contract which provides that Universal had the right:

> "To release, by mutual agreement between us, phonograph records of the compositions performed by you and recorded hereunder on any medium or device now or hereafter known under the name "MGM Records," or the primary label which we or our subsidiaries, affiliates, and licensees may from time to time elect."

(Id.) The SAC contends that if there is any ambiguity or conflict in the language of the 1959 Contract, "the course of dealing and contracts after the [1959 Contract] confirm a royalty payment by 50% of net revenue" for all licenses Universal made to unaffiliated third parties for non-mechanical recordings. (SAC, ¶ 6.)

Francis and Universal entered into a series of subsequent agreements and amendments following the 1959 Contract. In 1962, the 1959 Contract was amended in writing to continue the agreement for an additional five years. ("1962 Amendment," SAC, ¶ 8.) In November 1966, the parties agreed in writing to name Francis' production company, GGC Production Corp. ("GGC"), in place of her. ("1966 Contract," SAC, ¶ 8.) In January 1980, Francis, through GGC, entered into a new contract for additional recordings. ("1980 Contract," SAC, ¶ 9.) The 1980 Contract provided GGC with fifty percent of Universal's net royalties for any licenses Universal makes to non-affiliated third parties. (Id.)

The SAC contends that Universal granted unaffiliated third-party licenses of Francis' recordings through the internet for sale by download to consumers. (SAC, ¶ 10.) According to the SAC, these licenses are not recordings manufactured or sold by Universal. (SAC, ¶ 11.) Plaintiff alleges that Universal should render royalties to Frances in the amount of fifty percent of Universal's net proceeds received from third-party internet sales. (SAC, ¶ 11.) Instead, Universal calculates royalty payments as though Universal had manufactured and distributed 45 RPM records, at five percent of the ninety percent earned by Defendant. (SAC, ¶ 12.)

Based on these allegations, Plaintiff asserts four causes of action for (1) breach of the 1959 Contract; (2) breach of the 1966 Contract; (3) unjust enrichment; and (4) declaratory relief. (SAC, ¶¶ 15-29.)

Defendant filed a Motion to Dismiss the Second Amended Complaint on January 4, 2013. ("Motion," Doc. No. 35.) Plaintiff opposed on February 20, 2013. ("Opp'n," Doc. No.

44.)[2]  Defendants replied on January 28, 2013.  ("Reply," Doc. No. 35.)

## II. LEGAL STANDARD[3]

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  As a general matter, the Federal Rules require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In addition, the Court must accept all material allegations in the complaint – as well as any reasonable inferences to be drawn from them – as true. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 545. "[T]he pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).

## III. DISCUSSION

### A.      Requests for Judicial Notice

Defendant requests judicial notice of: (1) the 1959 Contract; (2) the 1966 Contract; (3) the 1980 Contract; (4) a November 20, 2002 letter from Plaintiff's counsel to Magistrate Judge Douglas F. Eaton, Southern District of New York in the action Francis v. UMG Recordings, Inc., No. 02 Civ. 1963 (LAK) ("New York Action"); (5) Plaintiff's brief in the new York Action filed on November 27, 2012; (6) Plaintiff's May 13, 2009 brief in the New York Action; and (7) the final judgment in the New York Action entered by the Honorable Barbara S. Jones, U.S. District Judge on September 21, 2012.  ("Universal RJN," Doc. No. 35-2, Exhs. A-G.)  The Court GRANTS Defendant's RJN as to all documents, except as to Exhibit D, the November 20, 2002 letter from Plaintiff's counsel to Magistrate Judge Eaton.  The 1959, 1966, and 1980 Contracts (RJN, Exhs. A-C) are all alleged in the SAC, but are not attached.  See Knievel v. ESPN, 393

---

[2] Plaintiff subsequently corrected her opposition on March 6, 2013.  (Doc. No. 51.)  All page numbers referenced in this Order will refer to the corrected opposition.

[3] Unless otherwise noted, all mentions of "Rule" refer to the Federal Rules of Civil Procedure.

F.3d 1068, 1076 (9th Cir. 2005) ("[U]nder the incorporation by reference doctrine, which permits us to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.") (internal quotation omitted). Exhibits E through G are motion papers and court orders filed in a federal court proceeding. The Court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992). The New York Action is directly related to this action as it involves the same parties and arises out of the same contracts at issue here. These documents are judicially noticed "only for the purpose of determining what statements are contained therein, not to prove the truth of the contents or any party's assertion of what the contents mean." United States v. S. California Edison Co., 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004). Exhibit D is a letter sent from Plaintiff's counsel to the Magistrate Judge presiding in the New York Action. (RJN, Exh. D.) It is not clear that the letter was filed in the New York Action or was part of the public record. See Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record. . . . Here, Defendants' request is limited to documents filed in the Wal-Mart litigation.") Therefore, the Court DENIES Defendant's RJN as to Exhibit D.

Plaintiff also submitted a declaration of Paul Sigelman requesting judicial notice of twenty-five documents. ("Francis RJN," Doc. No. 44, corrected at Doc. No. 51, Exhs. 1-25.) The Court GRANTS IN PART and DENIES IN PART Plaintiff's request for judicial notice. Many of Plaintiff's documents duplicate those submitted by Defendant. Exhibits 1, 5, 6, 7, 8, 9, 10, 12, and 21 are excerpts of the 1959 Agreement. Exhibits 2, 3, 4, 13, and 14 are excerpts of the 1966 Agreement. Exhibits 15, 16, and 17 are excerpts of the 1980 Agreement. For the reasons discussed above, the Court GRANTS Plaintiff's request for judicial notice as to Exhibits 1-10, 12-17, and 21. Exhibit 11 is a copy of the 1962 Amendment which is alleged in the SAC, the Court therefore GRANTS the request for judicial notice of Exhibit 11. See Sprewell v. Golden State Warriors , 266 F.3d 979, 988 (9th Cir. 2001). For the reasons discussed above, the Court also GRANTS Plaintiff's request for judicial notice of Exhibit 23, which is the Amended Complaint filed in the New York Action. Similarly, the Court GRANTS judicial notice of Exhibit 22 which is a declaration of Jeremy M. Creelan filed in the New York Action and attaching a 1958 agreement between the parties. As noted above, the Court only takes judicial notice of the existence of the documents filed in the New York Action, not "of one party's opinion of how a matter of public record should be interpreted." United States v. S. California Edison Co., 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004).

However, the Court DENIES Plaintiff's remaining requests for judicial notice of Exhibits 18-20 and 24-25. Exhibits 18 through 20 are copies of letters from Defendant to Francis or her representative dated March 16, 1982, April 7, 1983, and September 16, 1983. These letters are not alleged in the SAC, nor are they documents on which the allegations in the SAC necessarily rely. If the documents are not integral to the complaint, the Court should not consider them. See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). Moreover, documents subject to judicial notice are those which "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Plaintiff has not

shown that the letters are of indisputable accuracy.  Exhibit 24 is a copy of the New York Department of State, Division of Corporations entity information for Defendant indicating its principal place of business is in California.  The Court declines to take judicial notice of these irrelevant facts.  See CYBERsitter, LLC v. People's Republic of China, 805 F. Supp. 2d 958, 964 (C.D. Cal. 2011).  Finally, Exhibit 25 is the Settlement Agreement entered into by the parties in connection with the New York Action.  This document is not referenced in the SAC, nor is it a matter of public record.  Therefore, the Court declines to consider it.

**B.     Breach of Contract Claims**

  **1.     The Unambiguous Language of the Royalty Provision in the Agreements Controls**

  As Plaintiff defines it, the disagreement in the instant action is the royalty rate owed to Plaintiff for Universal's distribution of digital downloads and ringtones under the 1959, 1962 and 1966 Contracts (collectively, "Agreements").  Defendant contends the royalty rate is five percent, while Plaintiff argues it should be fifty percent.  (Opp'n at 3.)  The parties agree that New York law applies to Plaintiff's claims and the contracts at issue.

  The plain, unambiguous language of the Agreements is determinative here.  See Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000) ("Contract language is unambiguous when it has a definite and precise meaning . . . and concerning which there is no reasonable basis for difference of opinion.")  The sole paragraph in the 1959 Contract that calculates the payment of royalties derived from sales of Plaintiff's recordings is found in Section 5(a) which states:

   "We shall pay you for your services to be rendered hereunder and for the rights granted herein, a royalty of five percent (5%) of the suggested retail list price (exclusive of all taxes) of ninety (90%) percent of all records sold containing on both sides thereof a composition or compositions performed by you and recorded hereunder, manufactured and sold by us or by any subsidiary, affiliate or licensee, and one-half of such royalty for ninety percent (90%) of all records sold embodying such composition or compositions on only one side thereof."

(1959 Contract, Universal RJN, Exh. A, § 5(a).)  The plain meaning of this paragraph indicates that Plaintiff's royalties are calculated at five percent of the ninety percent earned by Defendant from the suggested retail price of all records sold.

  Plaintiff argues that the term "record" as used in Section 5(a) or the term "phonograph record" as used elsewhere in the Agreements must be limited to physical or material objects, not digital recordings.  However, the plain language of other sections of the 1959 Contract and the subsequent 1966 Contract as well as relevant case law demonstrate the deficiency in Plaintiff's argument.  Section 4(c) of the 1959 Contract states that Universal has the right to release "phonograph records of the compositions performed by you and recorded hereunder *on any medium or device now or hereafter known* . . . ."  (1959 Contract, § 4(c)) (emphasis added.) Section 4(a) of the 1959 Contract similarly states that Universal has the right "[t]o manufacture,

advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use, and by any method now or hereafter known, throughout the world, phonograph records, tapes, wire and *other reproductions embodying the performances* to be recorded hereunder . . . ." (1959 Contract, § 4(a) (emphasis added).)  Thus, the 1959 Contract contemplated that the term "phonograph record" included recordings on mediums other than those available in 1959, including intangible forms of recording developed thereafter.  Moreover, the 1966 Contract explicitly defines the terms "phonograph record" and "record" as "phonograph records and record albums of any r.p.m. and *any similar devices for the reproduction of sound reproduced on any material which may now or hereafter be known*, including, but not limited to, discs of wax, vinyl, or any other composition, or tape, film, or wire." (1966 Contract, Universal RJN, Exh. B, § 1) (emphasis added.)  As such, the Agreements contemplated that the term "record" encompassed any future medium that transmitted Plaintiff's sound recordings, including digital downloads and ringtones.

Plaintiff attempts to limit the definition of "record" and "phonograph record" as used in the 1959 and 1966 Contracts by relying on the principle of *ejusdem generis* -- a canon of construction that limits general terms that follow specific ones to matters similar to those specified.  See Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2171 n.19 (2012).  However, as Defendant correctly notes, under New York law, this canon "is an aid to be used when the meaning of a word or phrase is unclear, but it is inappropriate where it renders words or phrases meaningless or otherwise defeats the parties' intent." Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 371 F. Supp. 2d 571, 576 (S.D.N.Y. 2005).  As discussed above, the term "record" in the Agreements is not unclear.  The canon's application is inappropriate, where, as here, the parties unambiguously intended to expand, not limit, the definition of "record" to include future mediums.  Moreover, the canon is inapplicable here, as it is only to be used where the final item in a list is a general term.  See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 63 (2004) (*ejusdem generis* attributes to the last item in a sequence of items the same characteristic of discreteness that is shared by all the preceding items).  Section 4(c) does not include a list, and in the 1966 Contract, the definition at issue appears before the list and thus cannot be limited by the subsequent terms.  As such, the plain language of the Agreements controls, and the Court cannot use *ejusdem generis* to contrarily interpret the term "record" to exclude digital recordings.

In addition, several courts applying New York law have found that digital music files fall within the definition of recording "devices now or hereafter known."  Defendant's citation to Reinhardt v. Wal-Mart Stores, Inc., 547 F. Supp. 2d 346 (S.D.N.Y. 2008) is instructive.  In Reinhardt, the agreement provided that "records" or "phonograph records" meant "all forms of reproduction . . . now or hereafter known . . . ." Id. at 354.  The court found that the language clearly and unambiguously authorized digital uses and that the phrase "now or hereafter known . . . reveals that future technologies are covered by the agreement." Id.  The Court agrees with the interpretation in Reinhardt and finds that the definition of the term "record" as used in Section 5(a) of the 1959 Contract encompasses forms of recording known at the time and those developed since, including digital downloads.  See also Allman v. Sony BMG Music Entm't, 06 CV 3252 (GBD), 2008 WL 2477465, at *2 (S.D.N.Y. June 18, 2008) (finding that the term "phonograph record" contractually defined as "all forms of reproductions, now or hereafter

known" encompassed digital music files for purposes of calculating royalties).

The Court finds that the royalty rate for sales of digital downloads and ringtones of Plaintiff's recordings is controlled by the plain language of Section 5(a) of the 1959 Contract and relevant provisions of the 1966 Contract.

### 2. Other Sections of the Agreements Do Not Create Ambiguity

In both her SAC and opposition, Plaintiff ignores Paragraph 5(a) and instead argues that other provisions of the 1959 Contract support her argument that royalties for digital downloads are not controlled by the Agreements. Plaintiff specifically focuses on Section 4 of the 1959 Contract which outlines the rights and obligations of Universal.

Plaintiff proceeds on the theory that Section 4(a) allowed Universal to make, sell, license, or dispose of solely "material objects, such as phonograph records, tapes, wire and similar material objects, bearing copies of Francis' Recordings." (Opp'n at 8.) However, Section 4(c) required that "before [Universal] could move forward with exploitation of the Recordings in new media, [Universal] must reach a mutual agreement with Francis." (Opp'n at 10.) Plaintiff argues that the mutual agreement included an agreement as to the royalty calculation for all new media.

Section 4(c) states that Universal has the right:

> "to release, by mutual agreement between us, phonograph records of the compositions performed by [Francis] and recorded hereunder on any medium or device now or hereafter known under the name 'M-G-M Records,' or the primary label which [UMG] or our subsidiaries, affiliates and licensees may from time to time elect."

(1959 Contract, § 4(c).) Plaintiff's interpretation of this Section is entirely unsupported by the plain language. First, Section 4(c) does not state that the mutual agreement must include any renegotiation of royalties or in any way abrogates the royalty provision in Section 5(a). Second, as noted by Defendants, the phrase "mutual agreement between us" modifies the verb "to release." The clear interpretation of this phrase is that the parties were required to mutually agree on the release of Plaintiff's records, not on the royalties owed pursuant to the subsequent sale of those records. Third, even if Section 4(c) required the parties to mutually agree upon the royalties owed under the Agreements, there is no reason why this mutual agreement would be limited to future technologies such as digital recordings. In crafting this interpretation, Plaintiff ignores the language "any medium or device *now* or hereafter known." This phrase includes mediums and devices available in 1959, including material or physical objects, such as vinyl records. Finally, Plaintiff's interpretation of Section 4(c) conflicts with her argument that the term "phonograph records" excludes digital recordings. Importing Plaintiff's definition of phonograph record into Section 4(c) leads to the conclusion that no mutual agreement was necessary before Universal could release Plaintiff's digital recordings. For these four reasons, Plaintiff's interpretation of the 1959 Contract is inconsistent with the plain language and ignores provisions, namely Section 5(a), which control the payment of royalties at issue.

### 3. The Court Need Not Rely on the Parties "Course of Dealing"

In both her SAC and opposition, Plaintiff relies on the parties' "course of dealing"[4] since the Agreements to support her argument that Universal is obligated to pay Francis a royalty of fifty percent of revenues received from third-party internet transmissions of Plaintiff's recordings. (SAC, ¶ 6; Opp'n at 11-15.) Since the Court finds that the unambiguous language of the Agreements controls the royalty rate for digital downloads, extrinsic evidence including that related to the parties' "course of dealing" is inadmissible. See Constellation Power Source, Inc. v. Select Energy, Inc., 467 F. Supp. 2d 187, 210 (D. Conn. 2006) (applying New York law and stating that "in view of the Court's reliance on the clear language of the Letter Agreement, the Court need not rely on the parties' post-contract course of performance."); cf. Jobim v. Songs of Universal, Inc., 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) ("Since the term 'all monies earned' is ambiguous, the court may look to extrinsic evidence in interpreting the Subpublishing Agreements. Such extrinsic evidence includes the contracting parties' course of performance.").

Plaintiff argues that reference to the parties' "course of dealing" regarding subsequent royalty payments is necessary here where the terms of the Agreements required Universal to obtain a future mutual agreement from Plaintiff. However, Plaintiff's argument is belied by the placement of the phrase "by mutual agreement between us" discussed above. The plain meaning of the phrase requires Universal to obtain future consent from Plaintiff before releasing her recordings. Even if Universal violated this provision, which Plaintiff's alleged "course of dealing" does not attempt to demonstrate, this alleged breach would not entitle Plaintiff to increased royalties.

The Court finds that the Agreements unambiguously provide the calculation of royalties on digital downloads as five percent of ninety percent earned by Universal from the suggested retail price of all copies sold. Thus, Plaintiff's first claim for breach of the 1959 Contract and second claim for breach of the 1966 Contract are DISMISSED insofar as they allege that Defendant breached the contracts by failing to pay royalties on Internet downloads.

### C. Unjust Enrichment / Money Had and Received

Under New York law, claims for unjust enrichment or money had and received can proceed only in the absence of a valid express contract. See MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 157 F.3d 956, 964 (2d Cir.1998) ("[T]he existence of a valid and enforceable written

---

[4] Plaintiff appears to use the phrase "course of dealing" to refer to the parties' agreements, payments, and correspondence subsequent to the Agreements. This definition conflicts with the one used under New York law. See Well Luck Co., Inc. v. F.C. Gerlach & Co., Inc., 421 F. Supp. 2d 533, 540 (E.D.N.Y. 2005) ("A course of dealing is commonly defined as a sequence of *previous* conduct between the parties to an agreement . . . .") (emphasis added). Subsequent conduct between the parties is generally referred to as a "course of performance." See Jobim v. Songs of Universal, Inc., 732 F. Supp. 2d 407, 417 (S.D.N.Y. 2010). Nevertheless, for ease of understanding, the Court will use Plaintiff's definition of the phrase for the purpose of this Order.

contract . . . ordinarily precludes recovery in quasi contract [such as unjust enrichment] for events arising out of the same subject matter.") (internal quotations and citations omitted). Here, the Court finds that the Agreements are valid and enforceable written contracts that control the payment of royalties arising from internet downloads. Thus, Plaintiff's third claim for relief fails as it is based in theories of quasi-contract for "payments received by Defendant derived from internet downloads" -- the same subject matter as her contract claims.

Moreover, Plaintiff argues that Universal is unjustly enriched because its costs to license Plaintiff's recordings to internet companies for digital sales are negligible compared to the costs Universal incurred for the manufacture and sale of vinyl records at the time of the Agreements. (SAC, ¶ 13.) Therefore, Plaintiff contends that a fair royalty payment would be achieved by splitting the profits earned from the sale of digital downloads. (Id.) However, advances in future technologies were clearly anticipated by the Agreements. The Agreements plainly govern the distribution and sale of Plaintiff's recordings via any "devices for the reproduction of sound reproduced on any material which may now or hereafter be known." Thus, the emergence of digital sound recordings does not afford Plaintiff the right, under a theory of unjust enrichment, to rewrite the terms of the Agreements in order to secure a more favorable royalty formula. See Allman v. Sony BMG Music Entm't, 06 CV 3252 (GBD), 2008 WL 2477465, at *2 (S.D.N.Y. June 18, 2008) (making this argument).

Since a valid and enforceable contract addresses the subject matter in dispute, Plaintiff's claims for unjust enrichment or money had and received fail as a matter of law. The Court holds that Plaintiff's third claim for relief is DISMISSED WITH LEAVE TO AMEND.

## D. Declaratory Relief

Plaintiff's claim for declaratory relief relies on the allegation that "Universal is obligated to pay [Plaintiff] a fair percentage of net income which Universal receives from non-affiliated third party licenses for distribution and sale of internet downloads." (SAC, ¶ 29.) As discussed above, the Court finds that Universal's obligations regarding royalty payments on the sale and distribution of internet downloads are controlled by the terms of the Agreements. Since an express agreement controls these payments, arguments regarding equity and fairness are moot. Because the Court dismisses the underlying substantive claims, dismissal of Plaintiff's claim for declaratory relief is appropriate. See Jensen v. Quality Loan Serv. Corp., 702 F. Supp. 2d 1183, 1189 (E.D. Cal. 2010) (finding it appropriate to dismiss declaratory relief claim as redundant where there was no reason to believe it would resolve any issues aside from those already addressed by the substantive claims in the case).

Therefore, Plaintiff's fourth claim for declaratory relief is DISMISSED WITH LEAVE TO AMEND.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion to Dismiss WITHOUT PREJUDICE. Plaintiff's allegations regarding the royalty rate owed to Plaintiff for

Universal's distribution of digital downloads and ringtones under the 1959, 1962 and 1966 Contracts are foreclosed by the plain language of the agreements.  All four of Plaintiff's claims are DISMISSED WITH LEAVE TO AMEND.  Any amended pleading is due within 14 days of the date of this Order.

**IT IS SO ORDERED.**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2014, I caused a true and correct copy of the foregoing

to be filed electronically via this Court's CM/ECF system, and that notice of this filing was sent

by electronic mail to all parties by operation of that system or by mail to anyone unable to

receive electronic filings as indicated on the Notice of Electronic Filing.  Parties may access this

filing through the CM/ECF system.


    /s/ Jonathan M. Sperling
**COVINGTON & BURLING LLP**
Jonathan M. Sperling